**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| JERROLD B. KNOEPFLER, | : | |
| | : | |
| Plaintiff, | : | **OPINION** |
| | : | |
| v. | : | Civ. No. 01-5186 (WHW) |
| | : | |
| THE GUARDIAN LIFE INSURANCE | : | |
| COMPANY OF AMERICA and | : | |
| BERKSHIRE LIFE INSURANCE | : | |
| COMPANY OF AMERICA, | : | |
| | : | |
| Defendants. | : | |
| | : | |

**<u>Walls, Senior District Judge</u>**

In yet another chapter of this prolonged litigation arising from the denial of disability

insurance benefits, defendants move for partial summary judgment.  The central issues in this

motion are: first, whether there exists a third policy under which plaintiff Jerrold B. Knoepfler

may recover benefits and second, whether plaintiff is judicially estopped from recovering

benefits under one of the policies as a result of a contrary position taken before a bankruptcy

proceeding.  The Court heard oral arguments on June 18, 2009.  The motion is granted in part

and denied in part.

### FACTS AND PROCEDURAL HISTORY

In April 1990, plaintiff purchased a disability insurance policy from Guardian Life

Insurance Company of America ("Guardian") bearing a policy number, G-709770 ("DI policy").

(Certification of Raphael M. Rosenblatt in Support of Summary Judgment ("Rosenblatt Cert.")

Ex. 1.)  The policy provided a monthly benefit of $6,250 if plaintiff became totally disabled.

NOT FOR PUBLICATION

(Id.)  At around the same time, plaintiff's company, CKS, Inc., d/b/a Intertrade, also purchased a business expense overhead disability policy, G-709771, ("OE policy") from Guardian.  (Defs.' Statement of Undisputed Facts ("Def. Facts") ¶ 2.)  This policy provided for a monthly benefit of $5,200 and an aggregate benefit of $62,400, payable to plaintiff as the loss payee, in the event of plaintiff's total disability.  CKS, Inc., the owner of the policy, paid the premiums on the policy. (Id. ¶¶ 3-5.)

In June 1992, plaintiff's premium payment for the DI policy was returned for insufficient funds.  (Rosenblatt Cert. Ex. 2.)  Guardian informed plaintiff on June 11, 1992 that his policy had lapsed for nonpayment of premium and provided him with an opportunity to reinstate coverage by submitting an application for reinstatement, Form M1-65, and the premium payment by June 2, 1992.  (Id. Ex. 3.)  On June 15, 1992, Guardian again wrote plaintiff giving him a final notice of the policy's termination.  (Id. Ex. 4.)  That same day, plaintiff sent Guardian a completed reinstatement application with a check for the overdue premium but the check was again not honored for insufficient funds.  (Id. Exs. 5-6.)  Plaintiff was again notified of the lapse in coverage and was advised to apply for reinstatement and pay all outstanding premiums of $1,768.30.  (Id. Ex. 6.)  Plaintiff later provided the requested information to Guardian who approved his application for reinstatement on July 7, 1992.  (Id. Ex. 7.)  However, the premiums remained unpaid resulting in another letter from Guardian to plaintiff asking for prompt payment. (Id.)

The parties' accounts diverge from this point forward.  Although neither party disputes that plaintiff completed and signed a Form AP2-91, Application for Disability Income Insurance

NOT FOR PUBLICATION

(the "Application"), on July 14, 1992, the parties ascribe differing interpretations to this event.

Plaintiff claims that by submitting the Application and delivering a check for $1,749.30, he

intended and did purchase an additional policy for disability insurance.  (Certification of Jerrold

Knoepfler in Opposition to Summary Judgment ("Knoepfler Cert.") ¶ 12.)  Guardian, on the

other hand, says that the purpose of the Application was to reinstate the policy that had lapsed

through nonpayment of the premiums.  (Def. Facts ¶¶ 16-17.)  Guardian notes that a handwritten

remark in the Application states: "This application is to reinstate pol # G709770.  * These are

annualized figures.  See financial statement attached."[1]  (Rosenblatt Cert. Ex. 10.)

Plaintiff maintains that David Chotin, Guardian's insurance agent, picked up the

Application along with a check in the amount of $1,749.30 from plaintiff's office on July 14,

1992.  (Knoepfler Cert. ¶¶ 12-14.)  He also states that Mr. Chotin issued him a "Conditional

Receipt," numbered CM77386 and advised him that the new policy would have the same terms

and conditions as his other personal disability policy and that he would have to submit to a

medical exam.  (Id. ¶12; Certification of Robert E. Margulies in Opposition to Summary

Judgment ("Margulies Cert.") Ex. F; Knoepfler Cert. ¶ 14.)  Confusingly, the parties refer to this

document and another document both as the "Conditional Receipt."  The document submitted by

defendants is titled "Health New Business Suspense" and in the document, the box for

_____

[1]  Guardian also notes that plaintiff claimed at his deposition that the Application
containing the handwritten remark was not the one submitted to Guardian because it contains a
forged signature.  (Id. Ex. 9 at 198:15-299:13, 302:1-19.)  Plaintiff denies ever claiming that the
Application received by Guardian was a forgery; his claim at his deposition was only that the
document presented to him at that time was a forgery.  (Pl.'s Response to Def. Facts ¶ 29.)
Guardian has not submitted any authenticating evidence that the Application presented to
plaintiff during his deposition is the same document submitted for this motion as defendants'
Exhibit 10.

NOT FOR PUBLICATION

"Conditional Receipt for one Individual Health Application" is checked.  (Rosenblatt Cert. Ex.

12.)  So, although it is not inaccurate to refer to this document as a conditional receipt, to avoid

further confusion, the Court will refer to two purported conditional receipts by the exhibit

numbers as designated by the parties.  Defendant's Exhibit 12 bears a handwritten CM 77386,

the same number as the typewritten numbers that appear on Plaintiff's Exhibit F.  (Id.; Margulies

Cert. Ex. F.)  On Exhibit 12, the following handwritten note appears: "The premium is to

reinstate policy #G709770.  All necessary paperwork sent to Linda Mentzel."  (Id.)  Plaintiff

denies ever receiving Exhibit 12 and suggests that it may be a document prepared for Guardian's

internal use. (Margulies Cert. ¶ 23.)

According to plaintiff, a medical examiner contacted him in or about July 1992 to

schedule a medical exam but because of a planned vacation, the exam did not take place until

August 31, 1992.  (Knoepfler Cert. ¶ 15.)  Plaintiff also asserts that on August 7, 1992, he mailed

a check to Guardian Life in the amount of $1,499.30 towards reinstatement of the lapsed

disability policy (G-709770).  (Id. ¶ 16.)  After receiving an August 15, 1992 letter from

Guardian notifying him that his G-709770 policy was canceled, plaintiff contacted Mr. Chotin to

inquire.  (Id. ¶ 17.)  After checking with Guardian, plaintiff says, Mr. Chotin confirmed that

Guardian had received the medical exam for the new policy, policy number G-721385, which

was now in effect.  (Id. ¶ 18.)  Mr. Chotin also advised him that he did not send enough money to

reinstate the G-709770 policy so plaintiff sent another check in the amount of $250 to Guardian.

(Id. ¶¶ 18-19.)  According to plaintiff, Mr. Chotin later informed plaintiff that he had received the

new policy (G-721385) that was just issued but that the other policy (G-709770) was still not

NOT FOR PUBLICATION

reinstated because plaintiff owed another $19.  (Id. ¶ 20.)  Mr. Chotin arranged with Guardian

Life to take the $19 out of his commissions and apply it to the reinstatement of the policy.  (Id. ¶

21.)  These accounts are partially corroborated by a September 23, 1992 letter from Gerald J.

Clericuzio addressed to Mr. Chotin which stated: "I am pleased to advise you that Mr.

Knoepfler's contract has been reinstated ... Mr. Knoepfler sent us two checks in the amount of

$250 and 1499.30, totalling [sic] $1749.30.  Since we needed $1768.30 to reinstate the policy,

we will need $19.00 from Mr. Knoepfler at your earliest convenience."  (Margulies Cert. Ex. I.)

Defendant insists, however, that no new disability policy was issued on behalf of plaintiff

because the Application was a request for reinstatement of his lapsed policy, not for another

policy.  On September 8, 1992, Linda Mentzel, an employee of Guardian, drafted an Interoffice

"Speed Memo" referencing policy G709770, plaintiff's lapsed disability policy.  (Rosenblatt

Cert. Ex. 13.)  The memo stated: "We received a newly completed application instead of Form

M1-65.  Also Health Policy Service has $1749.30 (suspense ticket enclosed) which represents the

premium necessary to reinstate this policy.  As per Ed Rezek, please reinstate this policy as of

today."  (Id.)  By letter dated October 19, 1992, Guardian confirmed to plaintiff that policy

G709770 had been reinstated as of September 8, 1992.  (Id. Ex. 14.)  Guardian also notes that

there was no delivery of the policy which was a condition precedent for coverage.  (Def. Facts ¶¶

6, 28.)

In September 1995, plaintiff filed a notice of claim of his disability with Guardian.

(Rosenblatt Cert. Ex. 17.)  Plaintiff asserted that he became disabled in November or December

1992, when he began to suffer from depression and other psychological problems.  (Id.)  Plaintiff

NOT FOR PUBLICATION

further claimed that he sought treatment for his psychological illness in late 1992 but was in denial regarding his condition and did not realize that he was eligible for insurance benefits until September 1995.

Approximately one month later, on October 17, 1995, plaintiff's company, International Meat Traders, Inc. d/b/a Intertrade d/b/a CKS, Inc. filed a voluntary bankruptcy petition. (Rosenblatt Cert. Ex. 19.)  The OE policy was not scheduled in the Chapter 7 petition.  (Id.)

Upon defendants' denial of benefits under plaintiff's insurance policies, plaintiff filed suit in New Jersey Superior Court on October 10, 2001, which was removed to this Court.  The complaint alleged breach of contract under the two policies that plaintiff and his company purchased in April 1992 (G-709770 and G-709771).  The complaint did not mention a "third" policy.  On December 22, 2004, this Court granted defendants' motion for summary judgment, finding that plaintiff's action was barred by the three-year period of limitations set forth in the policies.  See Knoepfler v. Guardian Life Ins. Co. of Am., No. 01-5186, slip op. at 8 (D.N.J. Dec. 22, 2004).)  The Court of Appeals reversed.  See Knoepfler v. Guardian Life Ins. Co. of Am., 438 F.3d 287, 288 (3d Cir. 2006).  On remand, plaintiff sought and was granted leave to amend the complaint to include two new claims for relief, a bad faith claim (count four) and a claim for punitive damages (count five).  In the allegations supporting the new claims, plaintiff described the circumstances surrounding the "third" policy.  (Am. Compl. (Dkt. Entry No. 54) ¶¶ 6-8.)  On September 18, 2008, the Court granted defendants' motion for partial summary judgment and dismissed the newly added claims of bad faith and punitive damages.  Defendants now move for partial summary judgment seeking the following rulings: first, that a purported third policy never

-6-

**NOT FOR PUBLICATION**

existed and second, that plaintiff's claim under the OE policy (count three) should be dismissed based on judicial estoppel.  In the event that the Court does not judicially estop plaintiff from pursuing his claim under the OE policy, defendants ask the Court to interpret the policy as providing a maximum benefit of $62,400.  The Court heard oral arguments on June 18, 2009.

## LEGAL STANDARD

Summary judgment is appropriate where the moving party establishes that "there is no genuine issue as to any material fact and that [it] is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  A factual dispute between the parties will not defeat a motion for summary judgment unless it is both genuine and material.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48, 106 S. Ct. 2505, 2510 (1986).  A factual dispute is genuine if a reasonable jury could return a verdict for the non-moving party, and it is material if, under the substantive law, it would affect the outcome of the suit.  See Anderson, 477 U.S. at 248.  The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."  Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553 (1986).

Once the moving party has carried its burden under Rule 56, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts in question." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 1356 (1986).  To survive a motion for summary judgment, the non-moving party must present "more

NOT FOR PUBLICATION

than a mere scintilla of evidence showing that there is a genuine issue for trial." Woloszyn v. County of Lawrence, 396 F.3d 314, 319 (3d Cir. 2005).  The non-moving party must go beyond the pleadings and, by affidavits or other evidence, designate specific facts showing that there is a genuine issue for trial.  See Fed. R. Civ. P. 56(e); Celotex, 477 U.S. at 324.  "Conclusory statements, general denials, and factual allegations not based on personal knowledge [are] insufficient to avoid summary judgment."  Olympic Junior, Inc. v. David Crystal, Inc., 463 F.2d 1141, 1146 (3d Cir. 1972).

At the summary judgment stage, the court's function is not to weigh the evidence and determine the truth of the matter, but rather to determine whether there is a genuine issue for trial.  See Anderson, 477 U.S. at 249.  In doing so, the court must construe the facts and inferences in the light most favorable to the non-moving party.  See id. at 255; Curley v. Klem, 298 F.3d 271, 276-77 (3d Cir. 2002).

**DISCUSSION**

**I.    No Triable Issue of Facts Remains Regarding the Non-Existence of the "Third" Policy.**

Defendants argue that there is no genuine dispute of material fact regarding the non-existence of the third policy.  They emphasize that the Application submitted by plaintiff stated, "no insurance shall take effect unless and until ... the policy has been delivered to and accepted by [plaintiff]" and that plaintiff has submitted no evidence that he accepted such delivery. (Rosenblatt Cert. Ex. 10.)  However, defendants leave out a crucial phrase, "[e]xcept as provided in the conditional receipt" which precede the language regarding the delivery of the policy.  (Id.)

**NOT FOR PUBLICATION**

As set forth in the Application, a conditional receipt can provide temporary insurance coverage

before the delivery of the policy.  (Id. ("[i]f a premium has been paid for insurance in exchange

for the conditional receipt bearing the same number as this application, insurance will be in force

as set out in the terms of such receipt").)  See also Brill v. Guardian Life Ins. Co. of Am., 142

N.J. 520, 524-25, 666 A.2d 146 (1995) (interpreting similar language).  Thus, the Court must

determine whether a conditional receipt was issued to plaintiff.

Two documents in the record purport to be a conditional receipt.  Exhibit 12, one of the

two "conditional receipts," cannot create a dispute of fact regarding the non-existence of the third

policy because it contains a handwritten note: "The premium is to reinstate policy #G709770."

(Rosenblatt Cert. Ex. 12.)  A similar note regarding the intent to reinstate the policy #G709770

appears in the Application.  (Rosenblatt Cert. Ex. 10.)  Although plaintiff appears to have

claimed that a certain document purporting to be the Application was a forgery at his deposition,

he does not now disavow the Application as he himself has attached it as an exhibit to his

opposition.  (Margulies Cert. Ex. E.)  It should also be noted that in the section requiring that all

personal and business disability income insurance be listed, plaintiff only listed the OE policy.

(Rosenblatt Cert. Ex. 10.)

Exhibit F, the other "conditional receipt" in evidence, does not help plaintiff either.

Exhibit F appears on the last page of the Application packet numbered CM77386 and is titled

"CONDITIONAL RECEIPT FROM THE GUARDIAN LIFE INSURANCE COMPANY OF

AMERICA"  (Margulies Cert. Exs. E-F.)  This document states:

Insurance shall take effect on whichever of the following dates occurs last:
1.      the date of application; or

-9-

**NOT FOR PUBLICATION**

2.      the date of the first required Part II and medical examination; or

3.      the date requested by the insured at the time of application.

Such receipt shall be in force only for such proportional part of a year as the above payment bears to the full annual premium.

(Margulies Cert. Ex. F; Rosenblatt Cert. Ex. 10.)  Handwriting on Exhibit F noted the receipt of

advance payment of $1,749.30 representing a six-month premium.  Plaintiff contends that the

coverage under the third policy began when he completed his medical examination on August 31,

1992.  Plaintiff's claim is seriously undermined, however, by the terms contained on the reverse

page of the "conditional receipt."  Paragraph four of the receipt states, "This receipt is not valid

unless it has been signed by a licensed Guardian agent."  (Rosenblatt Cert. Ex. 10.)  The receipt

is not signed.  (Id.)  By its plain terms, the conditional receipt is not valid proof of temporary

insurance coverage.  Even if the receipt were valid, it must be construed as part of the

Application which contained the notation that the premium deposited with the Application is

intended to reinstate the lapsed policy, G709770.

Plaintiff next argues that summary judgment cannot be granted because Guardian's

internal documents show the existence of the third policy.  The documents, which are computer

printouts of plaintiff's policy status and a work/check sheet presumably from Guardian's internal

system, show a third number G721385 under "POLNO" and the word "canceled" appears under

"POLSTAT".  (Margulies Cert. Ex. L.)  Although plaintiff has not submitted any documentation

to explain what these abbreviations mean, it is probably safe to assume that POLNO stands for

policy number and POLSTAT stands for policy status.  Plaintiff asserts that the canceled notation

for policy number G723185 proves the existence of the third policy and notes that the

cancellation is ineffective as a matter of law because no notice of cancellation was ever given to

-10-

NOT FOR PUBLICATION

plaintiff.  Plaintiff further states in his brief that in September 1992 when he was at defendant's office he saw the third policy listed as active.  This assertion, however, does not appear in plaintiff's certification.  As such, the Court does not consider it.  Defendant counters that these printouts prove nothing because G7232185 was simply a number it assigned upon receiving the Application, on the form for new insurance.  On realizing that the Application was intended to reinstate plaintiff's lapsed policy, defendant says it "canceled" the number.

The factual disputes raised by plaintiff depend, for the most part, on plaintiff's certification that he purchased a third policy.  There is no documentary evidence of the third policy; in fact, all of the documentary evidence support the conclusion that, despite all of the confusion, the transaction in July 1992 was to reinstate the lapsed policy.  Plaintiff's subjective intent is insufficient to show the existence of an insurance contract, which like all contracts, requires a meeting of the minds.  On this point, plaintiff has failed to raise a genuine dispute of material fact.  The Court grants summary judgment on this issue to defendants.

**II.   Plaintiff Has Standing and Is Not Judicially Estopped From Pursuing His Claim Under the OE Policy.**

Defendants also seek summary judgment with respect to plaintiff's claim under the OE policy.  The relevant facts are these: The OE policy covered certain business expenses when the insured, plaintiff here, became totally disabled.  (Rosenblatt Cert. Ex. 16.)  The schedule page of the policy designated plaintiff as the loss payee, meaning that benefits under the policy would be payable to plaintiff; plaintiff's company, CKS, Inc. d/b/a Intertrade (and later d/b/a International Meat Traders), however, paid the premiums and was the named owner of the policy.  (Id. at

**NOT FOR PUBLICATION**

schedule page, p. 4 of application.)  Under the policy, the owner had certain enumerated rights,

including the right to cancel the policy and change the loss payee.  (Id. at 3, 8.)  The insured,

however, retained the right to convert the policy to a personal disability income policy and to

change the plan of insurance.  (Id. at 8.)  When International Meat Traders filed for bankruptcy,

plaintiff signed the bankruptcy petition on the corporation's behalf as its sole director and

president but did not schedule the OE policy as an asset of the corporation.  (Rosenblatt Cert. Ex.

19.)

Defendants' contentions are twofold: first, that plaintiff has no standing to claim any

benefits under the OE policy because the policy, as a non-administered asset of International

Meat Traders, remains the property of the bankruptcy estate, and second, that plaintiff is

judicially estopped from recovering benefits under that policy because he failed to list the OE

policy as an asset in the bankruptcy proceeding.  Plaintiff counters that he neither lacks standing

nor is he judicially estopped to claim benefits under the OE policy because International Meat

Traders had no interest in the policy.  Plaintiff does not dispute that the OE policy was not

scheduled in the bankruptcy petition.[1]

**A.      Standing**

---

[1] Plaintiff asserts that the trustee in International Meat Traders' bankruptcy case was made aware of the OE policy and that a settlement agreement was reached allowing plaintiff to pursue claims related to International Meat Traders in exchange for the estate receiving 50% of all recoveries.  This assertion is unsworn as it only appears in plaintiff's brief.  (Pl.'s Opp'n Br. at 15.)  The attached settlement agreement contains no references to the OE policy.  (Margulies Cert. Ex. S.)  Even if the Court were to credit plaintiff's unsupported contentions, the notice to trustee does not create a dispute of fact regarding plaintiff's failure to formally schedule the OE policy.  See generally Vreugdenhill v. Navistar Int'l Transp. Corp., 950 F.2d 524, 526 (8th Cir. 1991).

NOT FOR PUBLICATION

Defendants are correct in stating that under the Bankruptcy Code, the property of the debtor which is not administered by the trustee remains the property of the estate, even after the bankruptcy case is closed.  See 11 U.S.C. § 554(d); In re Pace, 146 B.R. 562, 566 (9th Cir. 1992); Vreugdenhill v. Navistar Int'l Transp. Corp., 950 F.2d 524, 526 (8th Cir. 1991). Defendants are also correct in their contention that the OE policy itself is part of the property of the bankruptcy estate.  See First Fidelity Bank v. McAteer, 985 F.2d 114, 116 (3d Cir.1993). This is so even if the "policy has not matured, has no cash surrender value and is otherwise contingent."  Id.  Because the OE policy was not formally scheduled and plaintiff has not advanced any admissible evidence that it was abandoned by the trustee or the bankruptcy court, the policy itself remains estate property.  See 11 U.S.C. § 554(d); Vreugdenhill, 950 F.2d at 526. That does not end the analysis here, however, because ownership of an insurance policy does not necessary equal ownership of the proceeds of that policy.  "Several different parties may have a property interest in such a policy or its proceeds, including the owner, the insured, and the beneficiary, all of whom may be different persons." McAteer, 985 F.2d at 117.  So it is here, while International Meat Traders owned the policy and paid the premiums, plaintiff was the insured and the loss payee.

In determining whether the proceeds of the policy owned by the debtor belong to the bankruptcy estate, the overriding question is "whether the debtor would have a right to receive and keep those proceeds when the insurer paid on a claim." In re Edgeworth, 993 F.2d 51, 55 (5th Cir. 1993).  As example, in In re Louisiana World Exposition, Inc. ("LWE"), 832 F.2d 1391 (5th Cir. 1987), the court held that the proceeds of a liability policy were not property of the

-13-

**NOT FOR PUBLICATION**

estate even though the debtor owned the policy.  There, the debtor corporation owned several

policies covering the liabilities of its directors and officers.  See id. at 1393.  The Fifth Circuit

held that the proceeds of a liability insurance policy belonged to the directors and officers

because the obligation of the insurance company was solely to the beneficiaries, not the owner of

the policy.  See id. at 1401.

Like the officers and directors in LWE, plaintiff is the insured and loss payee of the OE

policy, meaning that all benefits under the policy is payable to him.  Under New Jersey law, the

interest of a designated beneficiary of an insurance policy is a vested property right subject to

divestment only by the insured making a change in the beneficiary in the manner provided by the

policy contract.  See New York Life Ins. Co. v. Hunt's Estate, 150 N.J. Super. 271, 274-75, 375

A.2d 672 (App. Div. 1977).  Because the right to receive the proceeds belonged to plaintiff as

opposed to International Meat Traders, plaintiff has standing to claim benefits under the OE

policy.

      **B.**    **Judicial Estoppel**

Our task is not at end, however, because defendants also claim that even if plaintiff has

standing, his failure to list the OE policy on his company's bankruptcy petition bars plaintiff's

claim under the doctrine of judicial estoppel.  The doctrine of judicial estoppel provides that

"[w]here a party assumes a certain position in a legal proceeding, and succeeds in maintaining

that position, he may not thereafter, simply because his interests have changed, assume a contrary

position, especially if it be to the prejudice of the party who has acquiesced in the position

formerly taken by him."  New Hampshire v. Maine, 532 U.S. 742, 749, 121 S. Ct. 1808 (2001)

NOT FOR PUBLICATION

(quoting Davis v. Wakelee, 156 U.S. 680, 689, 15 S. Ct. 555 (1895)).  This rule "generally prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase." Id. (quoting Pegram v. Herdrich, 530 U.S. 211, 227 n.8, 120 S. Ct. 2143 (2000)); In re Chambers Development Co., Inc., 148 F.3d 214, 229 (3d Cir. 1998.  Judicial estoppel is "not intended to eliminate all inconsistencies, however slight or inadvertent; rather, it is designed to prevent litigants from playing fast and loose with the courts." Chambers, 148 F.3d at 229 (citation omitted).  Moreover, invocation of the doctrine is within a court's discretion.  New Hampshire, 532 U.S. at 750, 121 S. Ct. 1808.

Judicial estoppel has three elements: "(1) the party to be estopped is asserting a position that is irreconcilably inconsistent with one he or she asserted in a prior proceeding; (2) the party changed his or her position in bad faith, i.e., in a culpable manner threatening to the court's authority or integrity; and (3) the use of judicial estoppel is tailored to address the affront to the court's authority or integrity."  See Montrose Medical Group Participating Savings Plan v. Bulger, 243 F.3d 773, 777-78 (3d Cir. 2001).  Finally, equity requires that the court give the party to be estopped a meaningful opportunity to provide an explanation for its changed position.  See id. at 780 n.5.

### 1. Plaintiff's Alleged Inconsistent Representations

Defendants argue that plaintiff's present claim under the OE policy is irreconcilably inconsistent with his failure to list the OE policy as an asset on International Meat Traders' bankruptcy petition.  The alleged inconsistency arises from the fact that the OE policy at issue conferred a right on the owner of the policy, International Meat Traders, to change the policy's

NOT FOR PUBLICATION

loss payee. (Rosenblatt Cert. Ex. 16 at p. 2.)  Had plaintiff, who signed the petition on behalf of

International Meat Traders, disclosed the policy in the bankruptcy petition, the bankruptcy trustee

could have exercised the right to change the loss payee so that the estate would receive any

proceeds of the OE policy.  Although plaintiff protests that disclosure was unnecessary because

International Meat Traders' interest in the OE policy had no value, the right to change the loss

payee, however contingent, undoubtedly had value.

The Third Circuit has expressly left open the question of whether such non-disclosure,

standing alone, can support a finding that a plaintiff has asserted inconsistent positions within the

meaning of the judicial estoppel doctrine although a court in this District has applied the doctrine

in such cases.  Compare Ryan Operations G.P. v. Santiam-Midwest Lumber Co., 81 F.3d 355,

362 (3d Cir. 1996) (declining to decide the issue) with Clark v. Strober-Haddonfield Group, Inc.,

No. 07-910, 2008 WL 2945972 *2 (D.N.J. Jul. 29, 2008) (applying the doctrine to bar litigation

of a claim known to the debtor but not disclosed in bankruptcy).  The Court need not decide this

issue here because it finds that the inconsistent positions were not taken in bad faith and "the

doctrine of judicial estoppel does not apply when the prior position was taken because of a good

faith mistake rather than as part of a scheme to mislead the court."  Ryan, 81 F.3d at 362 (quoting

Konstantinidis v. Chen, 626 F.2d 933, 939 (D.C. Cir. 1980).

### 2.     Bad Faith

The Third Circuit has held that a rebuttable inference of bad faith arises when the record

evinces that the party had knowledge of the claim and a motive to conceal the claim in the face of

an affirmative duty to disclose.  See Krystal Cadillac-Oldsmobile GMC Truck, Inc. v. General

NOT FOR PUBLICATION

Motors Corp., 337 F.3d 314, 323 (3d Cir. 2003).  Although there is no serious dispute that

plaintiff knew of his claim under the OE policy at the time of the bankruptcy filing, it is not clear

that plaintiff knew that his disability claim could be a potential asset of International Meat

Traders.  Although the provision regarding the right of the owner of the policy to change the loss

payee was in the policy and constructive knowledge may be imputed to plaintiff, there is no

evidence that plaintiff had actual knowledge.  Plaintiff may have sincerely believed that only he,

as the insured and the loss payee, had the right to receive proceeds of the OE policy.  As there is

no evidence in the record to conclude that plaintiff had knowledge of International Meat Traders'

interest in the disability claim to raise an inference of bad faith, the Court finds that judicial

estoppel does not apply.

### 3.      Harm to Creditors

Applying judicial estoppel to bar plaintiff's claim in its entirety is further inappropriate

because it would not be tailored to address the affront to the court's authority or integrity, the

third element of judicial estoppel.  Although plaintiff, acting on behalf of International Meat

Trader, has violated his statutory duty of full disclosure, barring him from pursuing his claim

against defendant insurers would not cure the harm to creditors.  The better remedy would be to

enforce the settlement agreement that plaintiff reached with the trustee.  Plaintiff has represented

to the Court that he reached an agreement with the trustee wherein the estate will receive 50% of

any damages received from litigation involving International Meat Traders and that he

understood this litigation to be encompassed under that settlement agreement.  (Pl.'s Opp'n Br. at

15; Margulies Cert., Ex. S.)  Allowing plaintiff to pursue his claim under the OE policy and

**NOT FOR PUBLICATION**

providing the estate 50% of the damages should plaintiff prevail better serves the interests of the creditors and the bankruptcy court.  The Court will hold plaintiff to his representations.

Defendants' motion for summary judgment on the OE policy is denied.

**III.     The Aggregate Benefit Provision Is Not Ambiguous.**

In the event that the Court denies summary judgment on the OE policy, defendants ask the Court to interpret the policy as providing for a maximum benefit of $62,400 for one period of continuous disability.  Plaintiff resists this interpretation, arguing that there is ambiguity.

Under New Jersey law, if the terms of a contract are clear and unambiguous, the courts must enforce those terms as written.  See City of Orange Twp. v. Empire Mortgage Svcs., Inc., 341 N.J. Super. 216, 224, 775 A.2d 174, 179 (App. Div. 2001) (citing Kampf v. Franklin Life Ins. Co., 33 N.J. 36, 43, 161 A.2d 717, 720 (1960); Levison v. Weintraub, 215 N.J. Super. 273, 276, 521 A.2d 909, 910 (App. Div. 1987), cert. denied, 107 N.J. 650, 527 A.2d 470 (1987)). Whether a contract provision or term is clear or ambiguous is a question of law and therefore suitable for a decision on a motion for summary judgment.  See Driscoll Const. Co., Inc. v. State, Dept. of Transportation, 371 N.J. Super. 304, 313-14, 853 A.2d 270, 276 (App. Div. 2004).  "An ambiguity in a contract exists if the terms of the contract are susceptible to at least two reasonable alternative interpretations." M.J. Paquet, Inc. v. New Jersey Dep't of Transp., 171 N.J. 378, 396, 794 A.2d 141, 152 (2002) (citation omitted).

The schedule page of the OE policy specifies an aggregate benefit of $62,400. (Rosenblatt Cert. Ex. 16 at schedule page.)  Page five of the policy sets forth the benefits plaintiff is entitled to in the event of disability:

NOT FOR PUBLICATION

> The monthly benefit is shown in the schedule page.  It is the maximum rate at which we will compute benefits for each month in which you are disabled.

> The *aggregate benefit* is shown on the schedule page.  It is the maximum amount we will pay for all covered expenses in any one period of continuous disability.

(Id. Ex. 16 at p. 5 (emphasis in original).)  Plaintiff argues that the term "one period" is ambiguous because defendants failed to define what constitutes one period.  Plaintiff contends that this term is "essential in determining the frequency of payments to be made" and that he believed the aggregate amount was payable on a yearly basis throughout one continuous period of disability.  Plaintiff also presses a largely incoherent argument based on the waiver of premium benefit clause.  The OE policy provided for a waiver of the premiums if plaintiff was totally disabled before age 65 for at least 90 consecutive days.  (Rosenblatt Cert. Ex. 16 at p. 7.)  The policy further provided for all premiums to be waived that falls due while plaintiff was continuously disabled and to renew the policy for another term of same length as that in effect when the disability claim began, one year in this case.  (Id.)  After erroneously noting that the $62,400 is an yearly aggregate benefit, plaintiff says that it would be inconsistent with logic to suggest that it is a one time payment in light of the renewal clause.

Plaintiff's arguments are facially flawed.  The definition of "one period" is not necessary to determine the frequency of payments because the policy already had stated that benefits would be paid at the end of each month in which plaintiff was disabled.  (Rosenblatt Cert. Ex. 16 at p. 6.)  Plaintiff's subjective belief that the aggregate amount meant an yearly benefit has no basis in the language of the policy.  The aggregate benefit means exactly what the policy defined: the maximum amount that defendants will pay for any one continuous period of disability.  A

-19-

**NOT FOR PUBLICATION**

fundamental problem with plaintiff's argument is that defendants have never argued that the

policy provides for one time payment of the aggregate benefit; rather their position, supported by

the plain language of the policy, is that the maximum amount plaintiff may receive for one

continuous period of disability is $62,400.  Moreover, plaintiff's argument based on the renewal

clause makes little sense as the renewal clause has no bearing whatsoever on the aggregate

benefit of the policy.

A hypothetical will best illustrate how the benefits of the policy would be paid:  Assume

that plaintiff became disabled in June 2009, that his disability continued until August 2010, and

that the policy was up for renewal in October 2009.  As the Court reads the policy, plaintiff

would be entitled to a monthly benefit of $5,200 after an elimination period of two months.  The

premium due in October 2009 would be waived.  Benefit payments would cease in August 2010

after paying out $5,200 for 12 months reaching the maximum amount of $62,400.  If plaintiff's

disability continued after August 2010, he would not be entitled to any further monthly

payments.  He would, however, be entitled to a waiver of the annual premiums and continuation

of coverage under the policy.  The coverage would not be without value, notwithstanding the

cessation of the monthly indemnity payments:  If plaintiff recovered and then suffered another

disability, his monthly benefits, subject to the maximum amount, would resume, assuming

plaintiff met all other eligibility requirements under the policy.  As there are no ambiguity in the

policy concerning the aggregate benefit provision, the policy must be interpreted as it reads: the

policy provides a maximum benefit of $62,400 per period of continuous disability.

**NOT FOR PUBLICATION**

## CONCLUSION

The motion for partial summary judgment is granted in part and denied in part.  There is no triable issue of fact regarding the non-existence of the third policy.  Plaintiff is not judicially estopped from pursuing his claim under the OE policy.  The OE policy is subject to a maximum benefit of $62,400 per period of continuous disability.


<u>**s/William H. Walls**</u>
United States Senior District Judge


**Appearances:**

Robert E. Margulies
Margulies, Wind & Herrington, P.C.
Harborside Financial Center
Plaza 10 - Suite 1201
3 Second Street
Jersey City, NJ 07311-3988
          Attorney for Plaintiff Jerrold B. Knoepfler


David R. Kott
McCarter & English, LLP
Four Gateway Center
100 Mulberry Street
P.O. Box 652
Newark, NJ 07101-0652
          Attorney for Defendants The Guardian Life Insurance Company of
          America and Berkshire Life Insurance Company of America